Justin Matthew ADAMS, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–96–01737–CR.

Court of Appeals of Texas,
Dallas.

April 27, 1998.

Dana Deeann Huffman, Dallas, Deborah Carol Coleman, Irving, for appellant.

Wendy Koster, Asst. Dist. Atty., Dallas, for state.

Before THOMAS, C.J., and FARRIS[1] and MILLER[2], JJ.

## OPINION

CHUCK MILLER, Justice (Retired).

Appellant Justin Matthew Adams was charged by indictment with the offense of intoxication assault.[3] He waived his right to trial by jury and, upon his plea of not guilty, the case went to trial before the court, which ultimately found him guilty. The trial court sentenced him to serve ten years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Imposition of sentence was then suspended and Adams was placed on community supervision for ten years. On appeal, Adams brings six points. Points one, two, and six allege, essentially, insufficiency of the evidence in certain respects; points three and four reflect Adams's assertion that the trial judge committed reversible error in disallowing certain proffered evidence; the fifth point complains of the trial court's failure to quash a subpoena. We affirm.

To put these points in context, a rendition of the facts of the case is in order. The trial took place approximately fifteen months after the events in question. The evidence admitted at trial showed that in the early morning hours of Monday, July 5, 1995, Adams, who that day attained the age of 18 years, was driving his Chevrolet Blazer when it collided with a pickup truck operated by the victim,

---

1. The Honorable David F. Farris, Former Justice, Second District Court of Appeals, Fort Worth, Texas, sitting by assignment.

2. The Honorable Chuck Miller, Judge, Texas Court of Criminal Appeals, Retired, sitting by assignment.

3. Section 49.07 of the penal code, entitled Intoxication Assault, provides in pertinent part:

(a) A person commits an offense if the person, by accident or mistake, while operating an aircraft, watercraft, or motor vehicle in a public place while intoxicated, by reason of that intoxication causes serious bodily injury to another.

TEX. PENAL CODE ANN. § 49.07(a) (Vernon 1994).

twenty-six-year-old Julie Patterson, causing her serious bodily injury. The events leading up to the collision were described in detail by Patterson at the trial. On the night in question, Patterson had dropped a friend off at an apartment complex in north Dallas. As she was stopped at a four-way stop intersection within the complex, she saw Adams run one of the four stop signs and cross her path, nearly causing a collision. Upon leaving the complex, the two vehicles traveled in the same direction south on Preston Road through several major intersections. Adams' erratic driving caused Patterson to suspect that he was intoxicated and convinced her that she should be wary of the Blazer. After losing sight of the other vehicle, Patterson was stopped for a red light at the intersection of Preston Road and Alexis Drive when she again spotted Adams' Blazer approaching at a high rate of speed in her traffic lane. She watched as the Blazer collided with the rear-end of her pickup. The resulting impact caused severe damage to the vehicle and serious bodily injury to Patterson. Quickly after the collision, Adams' exited his vehicle and approached Patterson. With a thick tongue, Adams invited Patterson to pull over into a parking lot. Patterson replied that she was too injured to comply.

Soon thereafter, Dallas Police Officer Rogelio Reyes and his partner, Allen Lash, while on routine patrol received a radio report of the collision. Responding to the call, they arrived at the scene. Reyes inquired into Adams' welfare, and then Patterson's. After speaking with Patterson and observing that she appeared to be in pain, Reyes immediately summoned an ambulance. The officer then focused on Adams, who he noticed in the initial encounter had bloodshot eyes, unsteady balance, and smelled of alcohol. Reyes asked Adams how the collision occurred. Adams gave two varying accounts of the precipitating events. After further conversation with Adams, Reyes formed the opinion that Adams was intoxicated due to the introduction of alcohol into his body. Lash also observed Adams' slurred speech and unsteady balance, as well as a strong odor of alcoholic beverage emanating from Adams' person. Lash reached the same conclusion that Adams was intoxicated due to alcohol.

Reyes then called for a backup officer trained in detecting the effects of different types of intoxicants on individuals. Dallas Police Officer David Ruiz responded. Ruiz, possessed with the enhanced expertise intoxicant recognition, conducted three field sobriety tests on Adams. Adams failed the horizontal gaze nystagmus test (HGN), the stationary balance test, and the one-legged stand test. Based on these failures and the odor of alcohol about Adams, Ruiz formed the conclusion that Adams was intoxicated due to alcohol.

Reyes, after conferring with Ruiz, arrested Adams for driving while intoxicated, and transported him to jail. At the jail, Adams was taken to an intoxilizer room and, in the presence of Reyes, Lash, and an intoxilizer operator, given his Miranda rights. The events that transpired in the intoxilizer room were recorded on videotape.

The extent of Patterson's injuries became a hotly contested issue in the trial. Patterson testified that she suffered serious bodily injury in the wreck. At the scene, she refused the offer of an ambulance, citing economic reasons, but accepted a ride home from the police officers. Later, during normal business hours on July 5, 1995, Patterson contacted Adams' insurance company and reported the collision and her injuries. She also visited an emergency room at Baylor/Richardson Medical Center, but after the taking of x-rays of her back area, she was not admitted.

Five days later, Patterson saw her physician, Dr. Robert DeVries, with complaints of pain throughout her back and also in her chest area. After seeing the results of an MRI scan, DeVries ordered physical therapy for Patterson, suggested referring her to a medical specialist, and prescribed a muscle relaxer, a painkiller and an anti-inflammatory medication. By all accounts, Patterson had suffered what is commonly referred to as a soft tissue injury. Patterson began physical therapy at White Rock Physical Therapy in mid-July. At that time, she complained of pain so severe that she could not sit, stand, lift, bend, or walk. According to Patterson,

the next month of therapy produced no positive results. After reporting to DeVries that she actually felt worse after her month of working with White Rock Physical Therapy, the doctor referred her to Dr. Richard Jones, a sports medicine specialist.

Patterson began seeing Jones on August 17, 1995. At that time, she still maintained that the pain prevented her from sitting, standing, lifting, bending, or walking. Jones' diagnosis, after examination, was that Patterson suffered a closed head injury, traumatic sacroiliac inflammation, bulging disks in the lumbar spine, sacroiliac strain that caused a popped pelvic connecting bone, strain to the tissue surrounding the spinal disks, and, potentially, fibromyalgia. Jones prescribed sleeping medication and physical therapy. Jones further suggested that Patterson undergo psychological testing as a precaution to further evaluate the effects of the trauma she had suffered. Patterson remained on painkillers.

Patterson continued in various forms of physical therapy until mid-October, when she ceased therapy for economic reasons. She then moved to Minnesota to stay with a friend who would take care of her. There she returned to medical treatment and chiropractic therapy. Patterson returned to Dallas for the trial, testifying that she was in worse pain than ever and had difficulty, because of the pain, doing routine motions such as walking or bending. At trial, she believed that her injuries were worse, not better, after all her medical treatment and therapy. Except for a failed attempt at employment in mid-December of 1995, attributed to her physical pain in moving around, she had not worked since the collision. Patterson was applying for social security benefits.

The defense called Dr. Kendall Jones, a neurologist at Garland Community Hospital and Texas Imaging and Diagnostic Center. Jones reviewed Patterson's narrative MRI reports and related medical records. His conclusion, based on these documents, was that Patterson would not suffer "prolonged impairment of a bodily member."

The defense also called Gretchen Ganter, a physical therapist licensed by the State of Texas. Ganter reviewed the records of Patterson's physical therapy. Based on her experience and a review of those records, Ganter formed the opinion that Patterson would not suffer any protracted physical problems as a result of the collision.

Gregory Keith Adams, appellant's brother, testified that, in his capacity as his brother's insurance agent, he received the call from Patterson after the collision. Gregory took Patterson's claim information over the phone and, as an insurance agent, later forwarded it to the insurance company that wrote Adams' policy.

In his first point, Adams asserts that the State failed to prove Patterson suffered serious bodily injury. This is, upon a careful reading of his brief, a challenge to the legal sufficiency of the evidence on this issue.[4] In reviewing the legal sufficiency of the evidence, the reviewing court must determine whether, considering the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Jones v. State,* 833 S.W.2d 118, 122 (Tex.Crim.App.1992), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 678 (1993); *Emery v. State,* 881 S.W.2d 702, 705 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 1192, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995). The evidence, viewed in this light, and all reasonable inferences drawn therefrom, are evaluated in this review. *See Alvarado v. State,* 912 S.W.2d 199, 207 (Tex.Crim.App.1995). The trier of fact is the sole judge of the credibility of the witnesses and of the weight to be given their testimony, and is authorized to accept or reject any or all testimony of any witness and may look to all the evidence in the case that is offered by the State as well as the defendant in determining the facts and issues. *See Bonham v. State,* 680 S.W.2d 815, 819 (Tex.Crim.App.1984), *cert. denied,* 474 U.S.

4. His specific complaint is that, for this reason, the trial court erred in not rendering a judgment of acquittal on his request, but we will treat this point as a challenge to the sufficiency of the evidence.

865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985); *Pizano v. State*, 489 S.W.2d 284, 285 (Tex. Crim.App.1973).

The penal code defines serious bodily injury, in part and germane to this case, as physical pain, illness, or any impairment of physical condition that causes protracted loss or impairment of the function of any bodily member or organ. *See* TEX. PENAL CODE ANN. §§ 1.07(a)(8), 49.07(b) (Vernon 1994). Adams cites several cases wherein the court of criminal appeals held, on the facts before it, that the evidence was insufficient to support a finding of serious bodily injury. These cases included factual situations where the victim suffered a knife wound to the back, broken ribs, or a gunshot wound in the thigh. *See Moore v. State*, 739 S.W.2d 347, 352 (Tex.Crim.App.1987) (en banc); *Black v. State*, 637 S.W.2d 923, 926 (Tex.Crim.App. 1982); *Villarreal v. State*, 716 S.W.2d 651, 652 (Tex.App.—Corpus Christi 1986, no pet.). Adams then argues the evidence in this case. He points out that Patterson's x-rays, taken on July 17, 1995, revealed no abnormalities and the MRI taken a few days later yielded negative results for objective evidence of injuries. Further, Dr. Richard Jones' medical report predicted that Patterson would completely recover from her injuries, and the physical therapy records from the fall of 1995 reflected that Patterson reported that her pain was gone most of the time. Adams also claims a deficiency in the prosecution's proof because the State did not call an expert witness to testify that the injuries Patterson suffered were serious, as that term is defined by statute. Because of this evidence, or supposed lack thereof, Adams maintains no rational trier of fact could determine that Patterson suffered serious bodily injury as required by law.

The State, of course, urges us to conclude there is ample evidence to support the finding of physical pain and impairment of physi-

cal condition that caused protracted loss or impairment of the function of a portion of Patterson's body—the core of the statutory definition of serious bodily injury. *See* TEX. PENAL CODE ANN. §§ 1.07(a)(8), 49.07(b) (Vernon 1994). The State relies on *Moore*, which recognized that "protracted," as used in the penal code definition of serious bodily injury, means: "[C]ontinuing, dragged out, drawn out, elongated, extended, lengthened, lengthy, lingering, long, long-continued, long-drawn, never-ending, ongoing, prolix, prolonged, or unending." *Moore*, 739 S.W.2d at 352 (citing Burton, *Legal Thesaurus* 418 (1980 edition)).

The State cites us to cases wherein the loss or impairment of the function of any bodily member or organ was considered too short a duration to be deemed "protracted."[5] It also cites us to cases wherein the loss or impairment was considered a sufficient duration to be deemed "protracted."[6] The State then points to Patterson's testimony that she suffered debilitating pain from the time of the collision through the time of trial. This pain, according to her testimony, made it difficult or impossible to perform simple daily human functions such as walking, sitting, standing, lifting, or bending. During her testimony, Patterson admitted that some days were better than others, but she was firm in her contention that the pain was recurrent and incapacitating.

■ We realize that the evidence in the record emphasized by Adams is contradictory of the evidence emphasized by the State. However, as previously pointed out, in a legal sufficiency of the evidence review, we are to consider the evidence in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *Jones*, 833 S.W.2d at 122. Patterson's testimony, taken in its best light, clearly establishes a loss or impairment of the function of the trunk of her body, especially in the back. The loss or

---

5. Being bedridden for a week did not constitute a protracted loss or impairment. *See Moore*, 739 S.W.2d at 352. Burns and bruises that would go away did not constitute serious bodily injury. *See Pickering v. State*, 596 S.W.2d 124, 128 (Tex. Crim.App.1980). Loss of use of an arm for two weeks did not constitute a protracted loss or impairment. *See Villarreal*, 716 S.W.2d at 652.

6. Loss of partial use of the back for a period of three months did constitute a protracted loss or impairment. *See Coshatt v. State*, 744 S.W.2d 633, 635 (Tex.App.—Dallas 1987, pet. ref'd). Loss of use of a leg for three to four weeks did constitute a protracted loss or impairment. *See Madden v. State*, 911 S.W.2d 236, 244 (Tex. App.—Waco 1995, pet. ref'd).

impairment was extensive enough to impede walking, standing, etc. The loss continued for well over a year, a period long enough, in our view, to qualify as protracted. *See Moore*, 739 S.W.2d at 352. Considering this evidence in the light most favorable to the finding of guilt, we conclude the evidence of serious bodily injury is legally sufficient. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89; *Jones*, 833 S.W.2d at 122. As such, the trial court did not err in not rendering a judgment of acquittal on Adams' request. Point one is overruled.

■ In his second point, Adams contends that because Patterson testified the treatment for her injuries, occasioned over the fifteen months between the injury and the trial, actually made her condition worse, the serious bodily injury she suffered, to wit, the protracted loss or impairment of the function of any bodily member or organ, was not solely caused by Adams' collision with her truck. Adams' conclusion, even if taken as true, is irrelevant to the issue of sufficiency of the evidence to show that his actions caused the injuries Patterson was suffering from at the time of the trial. Even if medical treatment contributed to the damage caused by Patterson's injury, Adams' argument under this point is undermined by the penal code provision that soundly defeats the *probandum* upon which Adams relies.

Section 6.04(a) of the penal code provides: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a) (Vernon 1994). There is simply no evidence in the record to suggest that the treatment Patterson received was clearly sufficient to produce the debilitating pain that incapacitated her.

Adams cites *Barrera v. State*, 820 S.W.2d 194, 196 (Tex.App.—Corpus Christi 1991, pet. ref'd), to support his proposition. In *Barrera*, the Corpus Christi court stated: "The relevant inquiry [as to whether serious bodily injury has been caused] is the extent of the bodily injury as inflicted, not after the effects have been ameliorated or exacerbated by medical treatment." *Id.* This statement must be taken in context, however. In *Barrera*, the victim suffered serious bodily injury by an assault, but, after surgery, the victim was no longer at risk of death. *Id.* The contention was therefore made on appeal that serious bodily injury was not caused because medical treatment reduced the extent of the injuries so that they were, after treatment, merely "bodily injury." *Id.* Relying on *Brown v. State*, 605 S.W.2d 572, 575 (Tex.Crim.App.1980), the Corpus Christi court included the wording about injury being exacerbated by medical treatment, although the facts dealt only with injury being ameliorated by medical treatment. *See Barrera*, 820 S.W.2d at 196. *Brown* itself relied on an earlier case that also dealt only with injury being ameliorated by medical treatment, but contained the "ameliorated or exacerbated" wording nonetheless. *See Brown*, 605 S.W.2d at 575.

In none of these cases was there an issue of causation similar to the concept in section 6.04 of the penal code. In none of the cases was there an issue of exacerbation of injury by medical treatment. We are therefore compelled to regard the mention of exacerbation of injury by medical treatment to be pure dicta in *Barrera, Brown*, and cases cited therein. Finding the cases factually distinguishable from the case at bar, and finding the holding relied on by Adams to be dicta, we do not consider these cases controlling on the issue raised under this point.

Having so concluded, under the facts presented at trial, there is no evidence in the record showing that the treatment Patterson received was clearly sufficient to produce the debilitating pain that incapacitated her, and relying on the plain wording of section 6.04, we further conclude the fact that Patterson testified her condition was exacerbated by the treatment she received is irrelevant to the issue of what or who caused Patterson's serious bodily injury. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App.1991); *see also* TEX. PENAL CODE ANN. § 6.04(a) (Vernon 1994). Accordingly, we overrule Adams' second appellate point.

In Adams' sixth point, he also attacks the legal sufficiency of the evidence to prove that his intoxication caused the injuries suffered by Patterson. Adams correctly recites the applicable intoxication assault statute under which he was prosecuted.[7] That statute states that if a person causes serious bodily injury by reason of his intoxication, he commits the offense of intoxication assault. *See* TEX. PENAL CODE ANN. § 49.07(a) (Vernon 1994). Adams focuses on the words "by reason of his intoxication," and maintains that there was testimony from one of the officers that the streets were wet that night, and this might have been a *factor* contributing to the collision. Because, Adams continues, there is evidence that the wet roads were a factor, there is insufficient evidence that the collision and resulting injuries were caused *solely* "by reason of his intoxication."

■ Again, Adams overlooks section 6.04(a). *See id.* § 6.04(a). Section 6.04(a) applies to section 49.07(a). *See id.* § 1.03(b). Applying the plain wording and meaning of the concept of causation contained in section 6.04(a) to the "by reason of his intoxication" wording of section 49.07(a), it becomes clear that Adams is criminally responsible if the collision and resulting injuries to Patterson would not have occurred but for his intoxication, operating either alone or concurrently with the wet streets, unless the wet streets were clearly sufficient to produce the collision and resulting injuries to Patterson and the intoxication of Adams clearly insufficient. *See Boykin,* 818 S.W.2d at 785. Just as in the discussion of the previous point, under the facts presented in this case, there is no evidence in the record showing that the wetness of the streets was clearly sufficient to cause the collision. Point six is without merit and is overruled.

In points three and four, Adams complains of the exclusion of certain evidence arising from the conversation between Patterson and Gregory later in the day after the collision. In that conversation, Gregory asked Patterson if she was injured and recorded her answer on the claim form he was filling out. Point three deals with the trial court sustaining the State's objection to Gregory telling Patterson's answer. Point four deals with the trial court sustaining the State's objection to the admission of the claim form.

■ Adams does not apprise us where, if anywhere, in the record the excluded answer to the question is to be found, nor does he reference where the excluded form is contained in the record. In order for a complaint concerning the exclusion of evidence to be considered on appeal, the record must show what the excluded testimony would have been. *See Stewart v. State,* 686 S.W.2d 118, 122 (Tex.Crim.App.1984), *cert. denied,* 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985). Absent such a showing, or an offer, such as a bill of exception or offer of proof, as to what the excluded testimony would have been, nothing is presented for review. *See id.* Appellate rule 38.1(f) clearly requires record references to all facts pertinent to the issues presented. *See* TEX. R.APP. P. 38.1(f), (h). The former appellate rules also require that reference be made in the brief to the pages in the record where the matters complained of can be found. *See* former Tex.R.App. P. 74(d), (f). As the court of criminal appeals has plainly stated: "The right of appellate review does not extend to complaints which are not in accordance with this State's statutes relating to appellate review." *Foster v. State,* 779 S.W.2d 845, 864 (Tex.Crim.App.1989), *cert. denied,* 494 U.S. 1039, 110 S.Ct. 1505, 108 L.Ed.2d 639 (1990). Because Adams has not referenced us to any place in the record where it is revealed what the excluded testimony and evidence would have been, and in fact does not even assert in his brief what the evidence would have been, we find that error under these points has not been preserved for review. *See id.; see also* TEX.R.APP. P. 38.1(f), (h). Points three and four are overruled.

In point five, Adams complains of the trial court's action in not quashing a subpoena requested by the State compelling Adams to bring to court and tender the copy of the videotape taken at the police station after his arrest. Apparently the police or the District Attorney's office inadvertently destroyed the original videotape of those events. Prior to

---

7.   *See supra* footnote 3.

this inadvertent destruction, Adams was permitted to make a copy of the tape to prepare his defense for trial. After the accidental loss of the original tape was discovered, the State successfully compelled, by subpoena, Adams to bring his copy to court. The State introduced the tape into evidence and displayed it to the jury as part of its case-in-chief. On appeal, Adams alleges that this act of compulsion violated his privilege against self-incrimination and the attorney-client/work product privilege.

█ Adams cites to two turn-of-the-century cases from the court of appeals and court of criminal appeals holding that, under article I, section 10 of the Texas Constitution, an accused cannot be compelled to produce evidence in his possession. *See Meredith v. State,* 73 Tex.Crim. 147, 164 S.W. 1019, 1021 (1914); *Rollins v. State,* 21 Tex.App. 148, 17 S.W. 466, 466 (1886); *see also* TEX. CONST. art. I, § 10. While we do not dispute that article I, section 10 contains the prohibition, "[h]e shall not be compelled to give evidence against himself," and we do not dispute that in the context of the times the two cases cited above might have correctly stated the law, we conclude that modern interpretation of article I, section 10 is quite different and is well summarized by the Fourteenth Court of Appeals thusly: "The privilege against self-incrimination as contained in both the Fifth Amendment to the United States Constitution and Article I, § 10 of the Texas Constitution protects only testimonial communications." *Growe v. State,* 675 S.W.2d 564, 566 (Tex.App.—Houston [14th Dist.] 1984, no pet.); *see also Rodriguez v. State,* 631 S.W.2d 515, 517 (Tex.Crim.App. [Panel Op.] 1982).

The landmark case from the court of criminal appeals asserting this holding that the Texas Constitution protects only testimonial communications is *Olson v. State,* 484 S.W.2d 756, 772 (Tex.Crim.App.1969). In *Olson,* the court recognized the Supreme Court's interpretation of the Fifth Amendment privilege, worded in terms of prohibiting the government from compelling one to be a "witness

against himself," as prohibiting only testimonial evidence. *See id.* at 760–61. This was and is the view of the Supreme Court. *See Schmerber v. California,* 384 U.S. 757, 763–65, 86 S.Ct. 1826, 1831–33, 16 L.Ed.2d 908 (1966). The court of criminal appeals then went into an exhaustive study of the question of whether, from the phraseology in the Texas Constitution or any other source, article I, section 10 gave broader safeguards than the Fifth Amendment. *See Olson,* 484 S.W.2d at 759–71. The ultimate conclusion was that it did not. *See id.* at 771–72.

Although this analysis of the breadth of the Texas Constitution's protection under article I, section 10 was done almost two decades before the landmark case of *Heitman v. State,* 815 S.W.2d 681, 690–91 (Tex.Crim.App. 1991), which held that the protections of the Bill of Rights contained in the Texas Constitution would be interpreted independently of the counterpart interpretations of the Fifth Amendment done by the Supreme Court, we note that the analysis employed in *Olson* conforms in every way to the methodology promulgated by the *Heitman* case for use in making such an analysis. *See id.; Olson,* 484 S.W.2d at 759–71. Thus, we will follow the holdings of *Schmerber* and *Olson,* and in this post-*Heitman* era, hold that article I, section 10 of the Texas Constitution protects only testimonial communications. *See Schmerber,* 384 U.S. at 763–65, 86 S.Ct. at 1831–33; *Olson,* 484 S.W.2d at 771–72. Accordingly, the videotape in this case is subject to exclusion under article I, section 10 if it is testimonial in nature, and not subject to exclusion if it is not.

The court of criminal appeals has given us guidance in the area of the nature of DWI videotape evidence. *See Jones v. State,* 795 S.W.2d 171, 175–76 (Tex.Crim.App.1990). In *Jones,* the court held that a DWI videotape should not be suppressed unless the police seek to elicit a testimonial response not normally incident to arrest and custody. *Id.* at 176.[8] Later, in *Chadwick v. State,* 795 S.W.2d 177, 177 n. 1 (Tex.Crim.App.1990),

---

**8.** This holding must be taken in context, however, for there are other reasons for suppressing non-testimonial responses of an accused, such as a defendant's invocation of his constitutional

right to remain silent. *Dumas v. State,* 812 S.W.2d 611, 614 (Tex.App.—Dallas 1991, pet. ref'd).

and *Gassaway v. State*, 957 S.W.2d 48, 50–51 (Tex.Crim.App.1997), the court held that compelling a defendant to count backwards and recite the alphabet, did not amount to a violation of article I, section 10.

Since *Jones* and *Chadwick*, various Texas appellate courts have held, as the court of criminal appeals held in *Gassaway*, that requiring a defendant to recite the alphabet or perform other tests of verbal motor skills is not, by their very nature, compelling a testimonial response.[9] *See Vester v. State*, 916 S.W.2d 708, 712 (Tex.App.—Texarkana 1996, no pet.). Where the verbal motor skills tests approach a mental skills test, however, responses may be testimonial and thus inadmissible. *See, e.g., Vickers v. State*, 878 S.W.2d 329, 330–32 (Tex.App.—Fort Worth 1994, pet. ref'd).

■ The videotape in this case shows Adams, following the orders of the officer, counting backwards from thirty-eight to twenty-seven, reading a "six flags" card, and reciting the alphabet starting with "C" and ending with "Y." These tests of verbal motor skills fall squarely within the holdings allowing non-testimonial testing of verbal motor skills. *See Chadwick*, 795 S.W.2d at 177 n. 1; *Vester*, 916 S.W.2d at 712; *Dawkins v. State*, 822 S.W.2d 668, 671 (Tex.App.—Waco 1991), *pet. ref'd*, 825 S.W.2d 709 (Tex.Crim. App.1992).

■■ Adams also asserts that the videotape was protected work product, although he asserts later in his brief that it was protected by the attorney-client privilege. We hold that it is neither. The court of criminal appeals recently expounded upon the nature of these two privileges. *See Carmona v. State*, 941 S.W.2d 949, 953 (Tex.Crim.App. 1997). The work product doctrine creates a privileged area within which attorneys can analyze and prepare a case without fear that the fruits of their labor will be disclosed for the other side's use, while the attorney-client privilege is designed to promote communication between the client and the attorney (or the attorney's agents) unrestrained by fear

the communication will be divulged later. *See id.* at 953, 958 (concurring opinion). Facially, the State's videotape does not fall into either of these categories. The tape is a recording of an event made by the State and disclosed to the defense as part of statutory pretrial discovery. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(5) (Vernon Supp. 1998).

Adams argues only that the fact that the State complied with the law and gave him a copy of the videotape converts the tape into something protected by one or both of the privileges he now asserts. The notion that information which is tendered as a result of court ordered or statutorily mandated discovery, can be converted into privileged information, though it has not been altered since tendering, enhanced by fruits of an attorney's labor since tendering, or added to with communicative actions after tendering, is a novel one. Adams cites no authority to support this notion, and we reject it out of hand. *See Carmona*, 941 S.W.2d at 953. Point five is overruled.

We affirm the judgment of the trial court.

---

**9.** The Supreme Court has yet to definitively so hold, but has stated that requiring a suspect to reveal the physical manner in which he articulates words does not, without more, amount to compelling a testimonial response. *See Pennsylvania v. Muniz*, 496 U.S. 582, 592, 110 S.Ct. 2638, 2645, 110 L.Ed.2d 528 (1990).